IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 20, 2016 Session

## STATE OF TENNESSEE v. PAUL CLIFFORD MOORE, JR.

**Appeal from the Criminal Court for Knox County**
**No. 99919     Steven W. Sword, Judge**

---

**No. E2015-00585-CCA-R3-CD-FILED-MAY 12, 2016**

---

A Knox County jury convicted the Defendant-Appellant, Paul Clifford Moore, Jr., of three counts of second degree murder. See T.C.A. § 39-13-210(a)(1). The trial court imposed three fifteen-year sentences and ordered two of the three sentences served consecutively for an effective sentence of thirty years in confinement. On appeal, Moore argues (1) the trial court erred in instructing the jury that state of passion produced by adequate provocation is an essential element of the offense of voluntary manslaughter that must be proven beyond a reasonable doubt; (2) the trial court erred in instructing the jury that it must determine whether the State had proven the element of state of passion beyond a reasonable doubt; (3) the sequential jury instructions prevented the jury from ever returning a verdict of voluntary manslaughter in his case; (4) the trial court abused its discretion in admitting eyewitness testimony that Moore threatened to kill victim Amber Snellings; (5) the evidence is insufficient to sustain his convictions; (6) the trial court abused its discretion in imposing partially consecutive sentences; and (7) the cumulative effect of these errors violated his due process rights. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Mark E. Stephens, District Public Defender; Jonathan P. Harwell (on appeal), R. Scott Carpenter and Sarah Olesiuk Parker (at trial and on appeal), Assistant Public Defenders, Knoxville, Tennessee, for the Defendant-Appellant, Paul Clifford Moore, Jr.

Herbert H. Slatery, III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Kevin J. Allen, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

Moore was charged with three counts of first degree premeditated murder stemming from the fatal shooting deaths of Moore's wife, Christina White; his wife's twin sister, Bridgette Stagnolia; and Moore's wife's lover, Amber Snellings. Although Moore admitted to shooting his wife, he could not recall shooting his wife's sister or his wife's lover. Moore claimed that as a result of seeing the three victims engaged in sexual activity, he intended to commit suicide but instead the victims were killed. Prior to trial, Moore filed a motion in limine to exclude certain testimony from his wife's daughter, Courtney Roach. Following a hearing, the trial court ruled that Roach's statement about Moore's death threat to Snellings was admissible. At trial, Moore was convicted of the lesser included offense of second degree murder in each of the three counts.

**Trial.** Prior to their marriage in 2010, Moore and White had a "rocky" relationship. They often had heated arguments, which resulted in White gathering her belongings and moving in with family or friends before eventually returning to Moore. White and Moore separated and reconciled at least four times prior to marrying and had disagreements after their marriage. In early 2012, White left the marital home and moved into an apartment with her daughter, Courtney Roach, and White's identical twin sister, Bridgette Stagnolia. Although they were separated, Moore still gave White money and anything else she needed, including cigarettes. Amber Snellings, who lived in a different apartment in the same complex, quickly became friends with White, and their friendship eventually developed into a romantic relationship. When Moore learned of the relationship between his wife and Snellings, he was extremely distraught. He later told a friend that he had found his wife and Snellings in a bedroom together and what he had seen gave him "a sick feeling." In order to avoid interactions with Snellings, Moore stopped going to his wife's apartment and began leaving items for her with her aunt.

Although Moore and White were separated, they remained married and spent some time together. On March 31, 2012, the date of their second wedding anniversary, White agreed to go out with Moore and to stay with him at a hotel even though she was still romantically involved with Snellings. When Moore arrived at his wife's apartment to pick her up, Snellings was inside the apartment, and Moore waited outside until his wife joined him. Several hours later, White returned to her apartment in tears. Snellings, who was at the apartment when White got home, went with her into her bedroom. Shortly after White returned, Moore called his wife's daughter, Courtney Roach, and told her that he was coming over to the apartment. Roach informed her mother that Moore was coming back to the apartment to talk to her.

When Moore arrived, Roach allowed him into the apartment, and White left her bedroom, shutting the door behind her. Moore asked his wife, "[W]hy could you do this[?]" He told her he loved her and thought she loved him and wanted to work things out. Moments later, Moore "barged into" his wife's bedroom. Roach, who was

frightened for Snellings's safety, ran into the bedroom and stood between Moore and Snellings. Moore called Snellings "a bitch, a slut and a cunt" before threatening to kill her. He also told Snellings that she "broke up a happ[y] family and a happy home." Moore screamed at Snellings for several minutes before finally leaving the apartment. As he was walking out, he screamed at his wife, "[I]f you want to be with her, you can[.]"

The same day, Moore bought a Taurus nine-millimeter semiautomatic handgun and began carrying it with him in his truck. On April 21, 2012, Moore completed a handgun safety course, and on April 23, 2012, he filed an application for a handgun carry permit.

In April 2012, Courtney Roach moved out of her apartment and moved in with her future husband. Because White was no longer able to live with Roach, she moved back in with Moore on May 1, 2012. Stagnolia also lived with them. Although White lived with Moore, she continued seeing Snellings.

On May 20, 2012, White and Snellings talked on the phone and exchanged text messages. They planned to see one another the next day, and White told Snellings that she would call her prior to their visit. At 10:30 a.m. on May 21, 2012, White telephoned Snellings. At 2:12 p.m., Snellings called an acquaintance. The same day, at approximately 12:45 p.m., Moore made a delivery using a work truck, which had a GPS tracking system. He left the delivery location at 1:11 p.m. and deviated from his typical route back to work to drive to his apartment, where he stayed for a couple of minutes before leaving the area at 1:32 p.m. to return to work. A short time later, he informed his boss and coworkers that he was leaving to get lunch. He clocked out at 2:03 p.m. and never returned to work.

At 2:35 p.m., Moore telephoned his cousin, Darryl Moore. A minute later, he called one of his brothers, David Moore. Moore's other brother, Sammy Moore, called 911 at 2:43 p.m., informing them that Moore had killed his wife and wanted to turn himself into the police.

Officer Jeff Green of the Knoxville Police Department responded to a call directing him to go to the Black Oak Heights Baptist Church where he found Moore. As Officer Green approached, Moore said, "I killed my wife." He gave the officer the address where the crime had occurred and asserted, "I went broke three times for her." As Officer Green was placing him in the rear of his patrol car, Moore stated, "I loved that woman to death. All she cared about was damn fooling around on me and pills, Sir." He then told the officer, "I'm [a] honest hard working person. I just [got] fed up with her shit." When Officer Green asked if anyone else was at the crime scene, Moore replied, "Her sister and her girlfriend." When the officer asked if they were "okay," Moore said he did not know. After telling the officer that the two women screamed at him, he said, "I guess they are."

Moore then told Officer Green that he had disposed of his gun but did not identify its location, saying only that he had thrown it into the woods near his brother's home. Officers later found the handgun, a live round on the ground next to it, and the gun's magazine nearby.

Officer Kevin Ryan of the Knox County Sheriff's Office responded to a call about a possible shooting at Moore's apartment. He knocked on the apartment door, but there was no answer. He tried to open the door, but it was locked. When another officer told him that there appeared to be a person on the floor inside the apartment, Officer Ryan kicked in the back door. As he stepped inside, he saw the body of a woman face down on the floor between the kitchen and the living room. He found a second victim near the front door to the apartment. He went upstairs and found a third victim on the floor of a bedroom. None of the three victims showed any signs of life.

In the master bedroom upstairs, officers found an open drawer in a bedside table, which contained an empty leather holster for a nine-millimeter Taurus handgun and a box of Blazer brand nine-millimeter ammunition. A partially empty box of Blazer brand nine-millimeter ammunition was found in the bottom drawer of this bedside table. Officers found two spent casings in the kitchen, two spent casings on the stairs, and three spent casings in the upstairs bedroom.

In the living room, near Bridgette Stagnolia's body, officers observed a partially completed puzzle on the coffee table next to a half-full tray of pizza rolls, a lighter, a package of cigarettes, and an ashtray. In the upstairs bedroom where Snellings' body was found, officers discovered a full glass of tea containing ice that had been placed on a ledge.

Amber Snellings, whose body was found in the upstairs guest bedroom, sustained three gunshot wounds to her right fourth finger, the right side of her upper back, and the right side of her head. She had no defensive wounds. The medical examiner concluded that based on the trajectory of the bullets, Snellings had been lying in the bed at the time she was shot. Three spent shell casings were found on the floor of the bedroom near Snellings' body. At the time of the autopsy, Snellings was wearing a shirt, a pair of boxer shorts, a pair of shorts, a sports bra, socks, a ponytail holder, and earrings. At the time of her death, Snellings had both legs in the left pant leg of her shorts. Oral, vaginal, and anal swabs from Snellings yielded no DNA contributor other than Snellings.

Christina White, whose body was found at the bottom of the stairs, sustained gunshot wounds to the right side of her forehead and the left side of the back of her head. The parties stipulated that the wound to White's forehead occurred before the wound to the back of her head and that the second wound occurred when she was on the ground. The entry wound to her forehead showed gunpowder stippling, which meant that the

- 4 -

muzzle of the gun was between ten inches and two to three feet away from her when the gun was fired. Two spent shell casings were found near White's body. White also had bruises and scrapes consistent with a fall down a staircase. At the time of her autopsy, White was wearing a shirt, a pair of pants, a necklace, earrings, a hair tie, and socks but was not wearing a bra or underwear. Vaginal swabs from White showed the presence of sperm, and DNA testing established that this DNA profile belonged to Moore. However, the oral and vaginal swabs from White excluded Amber Snellings as a possible contributor to the DNA profile.

Bridgette Stagnolia's body was found near the kitchen. She sustained a gunshot wound to the center of her forehead and a second wound to the left side of the back of her head. The parties stipulated that the gunshot wound to Stagnolia's forehead occurred prior to the gunshot wound to the back of her head and that the second wound occurred when she was on the ground. The absence of gunpowder stippling meant that there was an intermediary target or that the gun was more than two or three feet away from Stagnolia when it was fired. At the time of her autopsy, Stagnolia was wearing a shirt, a pair of pants, and a hair tie but was not wearing a bra or underwear. Two spent shell casings were found on the ground next to Stagnolia's body. Oral, vaginal, and anal swabs from Stagnolia yielded no DNA profile other than the profile shared by Stagnolia and her twin sister.

Forensic analysis conducted by the Tennessee Bureau of Investigation (TBI) established that Moore's gun fired all of the spent shell casings found in the apartment. Microscopic examination of a bullet recovered from Snellings showed that it had been fired from Moore's gun. A bullet recovered from Stagnolia had similar characteristics to the bullets fired from Moore's gun but was too damaged to conclusively identify it as being fired from Moore's gun. The other two bullets recovered from White and Stagnolia did not have sufficient markings to identify whether they were fired from Moore's gun. All of the bullets and cartridge cases that were recovered were the same size, type, and design as the box of Blazer brand nine-millimeter ammunition found in bedside table in the master bedroom upstairs.

Paul Clifford Moore, Jr., the Defendant-Appellant, stated that despite the claims made by others, he and his wife had a "great" marriage. However, after having an injury at work, his medical bills negatively impacted their finances. When his wife began stealing his money and pain medication, they separated in the fall of 2011.

Moore said he spent time with his wife on March 31, 2012, their second wedding anniversary, and acknowledged that his wife was crying when he drove her back to her apartment. He said White was crying because he had refused to give her pain medication and because she had not been able to see her youngest daughter recently. Moore denied returning to his wife's apartment around 1:00 a.m. on April 1, 2012. He said that although Courtney Roach testified that he entered his wife's bedroom and yelled at

Snellings on April 1, 2012, this incident actually occurred on April 17, 2012. On that date, he discovered that his wife was having a relationship with Snellings when he showed up at Roach's apartment in an attempt to reconcile with her. He said he went to the apartment because Roach had asked him to "come get" his wife. When he arrived, he saw Roach in the parking lot. He asked her where White was, and Roach pointed in the direction of her apartment. Upon entering the apartment, he saw Snellings. Moore admitted that he screamed at Snellings and told her that "she ruined a good woman" but denied threatening to kill her. He said he also confronted his wife about her relationship with Snellings. Moore told White to get her things and go, but she eventually told him that she was staying there. Upon receiving this information, he walked out of the apartment, hugged Roach in the parking lot, and left in his truck.

Moore acknowledged that his family did not support his attempts to reconcile with White, but he wanted a reconciliation because he loved her. The first week of May 2012, Moore and White moved into an apartment, and a week later, White's twin sister, Bridgette Stagnolia, and her boyfriend moved in with them, although Stagnolia's boyfriend moved out a few days later. At the time, Moore believed his marriage was going well and acknowledged that he and White were having relations as husband and wife. However, the weekend before the incident on May 21, 2012, Moore became suspicious that his wife was seeing Snellings again but could not discover anything to confirm his suspicions.

On the morning of May 21, 2012, White went with Moore to an appointment at a laboratory near the local hospital before they ate breakfast together at a restaurant. Moore said they ran some errands together before he drove his wife home.

Although Moore claimed that he and his wife had gotten along well that morning, he stopped by their apartment after making a delivery because he thought she "was up to something." He called his wife before he got there, and when he arrived, he saw his wife's sister, Stagnolia, driving away in a car he did not recognize. He asked White if the car belonged to Snellings, and she said she did not know who owned the car. When he asked her if something was going on, White assured him that she was not "up to anything" and that she and Moore "were good."

Moore returned to work and later clocked out for lunch at 2:03 p.m. On his lunch break, he decided to go by his apartment to "see what they're up to[.]" He drove to his apartment and went inside. He said the apartment was quiet, and no one was downstairs. Moore walked up the stairs, and as he approached the top step, he saw his wife naked and on top of another naked "woman," who he suspected was Snellings, in their guest bedroom. He said that Stagnolia was also present in the bedroom and was topless. Moore said he felt angry, ashamed, betrayed, and overwhelmed by what he had seen. At that moment, Stagnolia told White that Moore was on the steps, and Moore went to his bedroom to get his gun to commit suicide.

Moore said that as he was walking down the stairs to go outside and shoot himself, he encountered his wife, who was now clothed. White asked him what he was going to do with the gun, and after telling her he was going to commit suicide, he "raised [the gun] up and shot her." Although Moore knew he was responsible for the shootings, he did not remember shooting his wife a second time or shooting Snellings. As Moore was about to leave the apartment to shoot himself, Stagnolia came running toward him yelling. Before closing the back door, he "turned and shot" Stagnolia. He said he could not remember firing the second shot at Stagnolia.

Moore got in his truck and put the gun to his head but could not shoot himself after he thought about his family. As he was driving away from the apartment, Moore accidentally called his cousin and got his voicemail. He then called his brother, David Moore, to tell him that he had shot his wife. Moore drove to the home of his other brother, Sammy Moore, and told him that he had shot his wife. He held the gun to his head a second time but could not kill himself in front of his brother. Moore asked his brother to call the police, and he agreed. Moore tried to give the gun to his brother, who did not want it, and he eventually threw the bullets, gun, and clip into the woods. His brother told him to go to the church, and he walked there. Moore later told officers that he had shot his wife but did not tell them that he had shot Snellings and Stagnolia because he did not recall shooting them at the time. He said that there were still large portions of the incident that he did not remember. Moore denied making a plan to kill his wife.

Moore admitted that he believed the car Stagnolia was driving the day of the killings belonged to Snellings. Although Moore claimed that he had first discovered that his wife was involved with Snellings on April 17, 2012, he admitted that he had received a voicemail from his wife on April 6, 2012, wherein his wife told him that she was unable to leave him a message earlier because Snellings had walked into the room.

Moore conceded that he originally left his apartment the day of the killings because Snellings's car was not there and returned home later that day because he "felt something wasn't right." He said that after observing his wife, Snellings, and Stagnolia involved in sexual activity on May 21, 2012, he reflected on what he had just seen and made a decision about what he was going to do next. He said that when he started walking toward his bedroom, he made the decision to get his gun. While he acknowledged that he had formed the intent to kill when he went to get his gun, Moore claimed that he had only formed the intent to kill himself. He said that the handgun's safety was on at the time he retrieved it from the bedside table, and despite his claim that he intended to leave the apartment before committing suicide, Moore conceded that he had taken his gun's safety off when he removed it from its holster inside the house. Moore also acknowledged that the location of the shell casings in the guest bedroom indicated that he was advancing into the room as he fired the shots, even though he

claimed to have no memory of doing so. He also admitted telling his wife that Snellings was not to be in their apartment.

Moore said that when he found his wife engaged in sexual activity with Snellings on April 17, 2012, he did not consider shooting himself. However, he admitted that he was angry and that he called Snellings a "bitch" after observing them together. He denied threatening to kill Snellings on April 17 but conceded that Roach had stood between him and Snellings. He acknowledged that he bought a gun after the April 17, 2012 incident but claimed that the purchase was meaningless because he bought guns "all the time." Moore admitted that he was thinking clearly enough to call his brother and to operate his truck after killing the victims. While he could not remember locking his apartment door behind him after the shootings, Moore acknowledged that officers had to kick in the back door to get inside his apartment. He denied placing the live round and gun in one location and the magazine in another location. Instead, he claimed he threw the gun and the live rounds together into the woods and then threw the magazine into the woods after his brother had instructed him to do so.

The defense called Alan McFarland, White's stepfather, who testified that White never told him that Moore threatened to kill any individuals after he discovered her engaged in sexual activity with Snellings.

## ANALYSIS

**I. State of Passion as Element of Crime of Voluntary Manslaughter.** Moore argues that the trial court erred in instructing the jury that state of passion produced by adequate provocation is an essential element of the offense of voluntary manslaughter that must be proven beyond a reasonable doubt. He claims that Tennessee's statutory scheme, if properly interpreted, "sets out a framework where state of passion is a defense to second degree murder and therefore, if raised by the proof, its absence must be proven beyond a reasonable doubt." He adds that "the contrary approach taken by the pattern instructions is not required by precedent." Moore claims that if the jury instructions had treated state of passion as a defense, rather than an element of voluntary manslaughter that must be proved beyond a reasonable doubt, he would have been acquitted because the State failed to prove the absence of state of passion beyond a reasonable doubt at trial.

In Moore's case, the trial court provided the following jury instructions on the offenses of second degree murder and voluntary manslaughter, the distinction between these two offenses, and the order of consideration of these offenses, which substantially follows Tennessee Pattern Jury Instructions 7.05(a), 7.06, and 41.01:

Any person who commits second-degree murder is guilty of a crime.

- 8 -

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements, and there are two. Again, the difference between the first, second, and third counts is the alleged victim.

The first element of second-degree murder is that the defendant unlawfully killed the alleged victim:

As to the first count, the alleged victim is Christina Moore; as to the second count, the alleged victim is Bridgette Stagnolia; as to the third count, the alleged victim is Amber Snellings.

And the second element is that the defendant acted knowingly.

"Knowingly" means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim. The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

"Intentionally" has been previously defined for you.

The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

"Passion" is defined as any of the human emotions known as anger, rage, sudden resentment, or terror which render the mind incapable of cool reflection.

If you have a reasonable doubt as to the defendant's guilt of second-degree murder, a lesser-included offense, in the first, second, and/or third counts, then your verdict must be not guilty as to this offense or offenses and then you shall proceed to determine his guilt or innocence of voluntary manslaughter, a lesser-included offense of the first, second, and third counts.

Any person who commits voluntary manslaughter is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the following essential elements. Again, there are three.

The first element, that the defendant unlawfully killed the alleged victim.

As to the first count, the alleged victim is Christina Moore; as to the second count, the alleged victim is Bridgette Stagnolia; as to the third count, the alleged victim is Amber Snellings.

And the second element is that the defendant acted intentionally or knowingly.

And the third element, that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Once again, the distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

"Passion" is defined as any of the human emotions know as anger, rage, sudden resentment, or terror which render the mind incapable of cool reflection.

"Knowingly" and "intentionally" have been previously defined for you.

If you have a reasonable doubt as to the defendant's guilty of voluntary manslaughter, a lesser-included offense in the first, second, and/or third counts, then your verdict must be not guilty as to this offense and then you shall proceed to determine his guilt or innocence of reckless homicide, a lesser-included offense of the first, second, and third counts.

. . . .

In reaching your verdict, you shall first consider the offense charged in the indictment. If you unanimously find the defendant guilty of that offense beyond a reasonable doubt, you shall return a verdict of guilty for that offense. If you unanimously find the defendant not guilty of that offense or have a reasonable doubt of the defendant's guilt of that offense, you shall then proceed to consider whether or not the defendant is guilty of the next lesser-included offense in order from greatest to least within that count.

You shall not proceed to consider any lesser-included offense until you have first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense or you unanimously have a reasonable doubt of the defendant's guilt of that offense. If you have a reasonable doubt of the guilt of the defendant as to all offenses charged and included in that count, you shall return a verdict of not guilty on that count and proceed to the next count.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a), 7.06, and 41.01 (16th ed. 2012).

Moore asserts that the 1989 revisions to the criminal code did not dramatically change the malice-based distinction between second degree murder and voluntary manslaughter, which required the State to disprove state of passion in order to obtain a murder conviction. He claims that although the revisions to the criminal code eliminated the concept of malice and simplified the definition of manslaughter, the Sentencing Commission explicitly denied making substantive changes to this offense, stating, "While the terminology is slightly different from the common law definition of voluntary manslaughter, the basic principles of voluntary manslaughter remain intact in this section." See T.C.A. § 39-13-211, Sentencing Comm'n Cmts. Nevertheless, Moore claims that the pattern instructions on voluntary manslaughter "constitute[] a drastic change from prior law" because they treat state of passion produced by adequate provocation as an essential element that must be proven beyond a reasonable doubt. Instead, he claims the instructions should have treated state of passion as a defense to second degree murder, which if fairly raised by the proof, must be disproven by the State beyond a reasonable doubt. He claims that because the evidence at his trial "present[ed] a textbook example of state of passion," the State cannot establish that this error was harmless beyond a reasonable doubt, and he is entitled to a new trial.

**A. Tennessee's Statutes.** Moore argues that Tennessee's current statutory scheme sets out a framework where state of passion produced by adequate provocation is a defense to second degree murder. First, he references Tennessee Code Annotated section 39-11-201, which sets out the following "general provisions" regarding the burden of proof:

No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:

(1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;

(2) The culpable mental state required;

- 11 -

(3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and

(4) The offense was committed prior to the return of the formal charge.

Id. § 39-11-201(a).

Moore also references Tennessee Code Annotated section 39-11-203 regarding "defenses":

(a) A defense to prosecution for an offense in this title is so labeled by the phrase: "It is a defense to prosecution under . . . that . . ."

(b) The state is not required to negate the existence of a defense in the charge alleging commission of the offense.

(c) The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof.

(d) If the issue of the existence of a defense is submitted to the jury, the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted.

(e)(1) A ground of defense, other than one (1) negating an element of the offense or an affirmative defense, that is not plainly labeled in accordance with this part has the procedural and evidentiary consequences of a defense.

(2) Defenses available under common law are hereby abolished.

Id. § 39-11-203 (emphasis added); see id. § 39-11-203, Sentencing Comm'n Cmts. ("The defendant has the burden of introducing admissible evidence that a defense is applicable. If the defense is at issue, the state must prove beyond a reasonable doubt that the defense does not apply."). Moore contends that when the defense of state of passion produced by adequate provocation is "fairly raised" by the proof, the trial court should instruct the jury that any reasonable doubt as to the existence of this defense requires the defendant to be acquitted of second degree murder. In other words, Moore asserts that "state of passion must be disproven [by the State] beyond a reasonable doubt for a second-degree murder conviction."

Consequently, Moore claims that the jury instructions should have indicated that voluntary manslaughter operates as a partial defense in a first or second degree murder

- 12 -

prosecution, a notion that has been recognized by this court in the past. In <u>State v. Jeffrey Lee Mason</u>, No. M2002-01709-CCA-R3-CD, 2004 WL 1114581, at *3 n.2 (Tenn. Crim. App. May 19, 2004), <u>perm. app. denied</u> (Tenn. Nov. 15, 2004), this court considered whether state of passion due to adequate provocation functioned as a defense to first or second degree murder:

> [T]he burden, for all practical purposes, falls on the defendant to establish the elements of passion and provocation; that burden then shifts to the state to prove the absence of those factors. In consequence, passion and provocation most often operate as a partial defense in a first or second degree murder prosecution or, as in this case, an attempted first degree murder prosecution. That said, it is perhaps time that the law is changed to conform to the reality that occurs in the trial court.
>
> Judge Smith suggests that this might be done by considering "passion produced by adequate provocation" as a partial defense under Tennessee Code Annotated section 39-11-203(e)(1), which provides that "[a] ground of defense, other than one (1) negating an element of the offense or an affirmative defense, that is not plainly labeled in accordance with this part has the procedural and evidentiary consequences of a defense." Tenn. Code Ann. § 39-11-203(e)(1). Ultimately, however, this matter is perhaps one more appropriately resolved by the legislature than the courts.

This sentiment was also echoed by Judge Witt in his separate concurrence in <u>State v. Khaliq Ra-El</u>, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *6 (Tenn. Crim. App. July 11, 2014) (Witt, J., concurring), <u>perm. app. denied</u> (Tenn. Nov. 20, 2014): "[T]he reference to passion and provocation in the voluntary manslaughter statue does not denote an essential element of the offense[; instead it] describes a dispensation to a defendant who, having intentionally or knowingly killed another, would otherwise be guilty of first degree or second degree murder respectively." Moore asserts that it is unnecessary for statutory law to be changed in order to treat state of passion as a partial defense and that a mere change in the pattern jury instructions would accomplish this goal.

Before addressing Moore's specific claims, we find it helpful to briefly review the changes made to the murder and manslaughter statutes. Prior to the revision of the criminal code in 1989, "Tennessee law provided that an unlawful killing 'with malice aforethought, either express or implied,' constituted the offense of murder." <u>State v. Williams</u>, 38 S.W.3d 532, 536 (Tenn. 2001) (quoting T.C.A. § 39-2-201 (1982) (repealed)). At that time, malice was defined as "the intent to do any unlawful act that will likely result in taking the life of another[.]" <u>State v. West</u>, 844 S.W.2d 144, 147 (Tenn. 1992) (citing <u>Humphreys v. State</u>, 531 S.W.2d 127, 133 (Tenn. Crim. App. 1975);

<u>Bailey v. State</u>, 479 S.W.2d 829 (Tenn. Crim. App. 1972)). "If the murder was 'perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious and premeditated killing' or was committed during the commission of a felony, the killing constituted first degree murder." <u>Williams</u>, 38 S.W.3d at 536 (quoting T.C.A. § 39-2-202(a) (repealed)). All other murders constituted second degree murder. <u>Id.</u> (citing T.C.A. § 39-2-211(a) (repealed)). In addition, the offense of manslaughter at that time was defined as "'the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act.'" <u>Id.</u> (quoting T.C.A. § 39-2-221 (repealed Nov. 1, 1989)). Cases also defined the offense of voluntary manslaughter prior to 1989 as "'the unlawful and intentional killing by one of another, without malice, but upon a sudden heat or passion produced by provocation adequate to obscure the reason of an ordinary man, and thus negative malice.'" <u>Id.</u> (quoting <u>Smith v. State</u>, 370 S.W.2d 543, 545 (Tenn. 1963)). Prior to the 1989 changes to the criminal code, the element that distinguished second degree murder from voluntary manslaughter was the presence or absence of malice at the time of the killing. <u>Id.</u> However, the 1989 revision of the code, which constituted a "comprehensive modernization" of Tennessee's criminal law, removed malice as an essential element of murder in the first degree and murder in the second degree. <u>Id.</u> at 538; <u>see</u> <u>State v. Martin</u>, 702 S.W.2d 560, 563 (Tenn. 1985), <u>overruled on other grounds by</u> <u>State v. Brown</u>, 836 S.W.2d 530, 543 (Tenn. 1992). Following the 1989 revision, the "essential element" that now separates second degree murder from voluntary manslaughter "is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" <u>Williams</u>, 38 S.W.3d at 538 (quoting T.C.A. § 39-13-211(a)).

After considering these statutory changes, we must interpret the current versions of the second degree murder and voluntary manslaughter statutes. Statutory construction is a question of law, which this court reviews de novo. <u>State v. Gomez</u>, 367 S.W.3d 237, 243 (Tenn. 2012) (citing <u>State v. Walls</u>, 62 S.W.3d 119, 121 (Tenn. 2001)). In interpreting statutes, we must "ascertain and give effect to the intent and purpose of the legislature." <u>Walls</u>, 62 S.W.3d at 121 (citing <u>Freeman v. Marco Transp. Co.</u>, 27 S.W.3d 909, 911 (Tenn. 2000); <u>Mooney v. Sneed</u>, 30 S.W.3d 304, 306 (Tenn. 2000)). Legislative intent and purpose are ascertained "from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application." <u>State v. Blackstock</u>, 19 S.W.3d 200, 210 (Tenn. 2000). However, if a statute's language is ambiguous, then "we must look to the entire statutory scheme and elsewhere to ascertain legislative intent and purpose." <u>Walls</u>, 62 S.W.3d at 121 (citing <u>Freeman</u>, 27 S.W.3d at 911).

With these principles in mind, we note that second degree murder is defined as "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). In addition, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in

an irrational manner." Id. § 39-13-211(a). We conclude that the language in these statutes is clear and unambiguous. Although Moore strenuously argues that Tennessee's statutory scheme sets out a framework where state of passion produced by adequate provocation is a defense to second degree murder, both the second degree murder statute and the voluntary manslaughter statute are devoid of any indication that voluntary manslaughter is a defense or partial defense to the crime of second degree murder. Instead, these statutes make it clear that voluntary manslaughter is a separate criminal offense rather than a defense to second degree murder. Moore's interpretation of the voluntary manslaughter statute, which only allows voluntary manslaughter to exist as a lesser included offense of first or second degree murder and forecloses its existence as a separate crime, is not supported by the clear and unequivocal language in these statutes.

Because Moore so heavily relies on Tennessee Code Annotated section 39-11-203, we will also consider whether this code section provides support for his claim that state of passion produced by adequate provocation operates as a defense to second degree murder. Code section 39-11-203(d) states that "[i]f the issue of the existence of a defense is submitted to the jury, the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted," and Code section 39-11-203(e)(1) provides that "[a] ground of defense, other than one (1) negating an element of the offense or an affirmative defense, that is not plainly labeled in accordance with this part has the procedural and evidentiary consequences of a defense." Although Moore's argument heavily relies on Code section 39-11-203, subsections (d) and (e)(1) do not identify state of passion as a defense to first or second degree murder and do no more than generally describe defenses within the context of the State's burden of proof. After considering the pertinent statutes, we disagree with Moore that Tennessee's statutory scheme sets out a framework where state of passion is a defense to second degree murder. Instead, after applying the aforementioned principles of statutory construction, we conclude that the legislature plainly intended for state of passion produced by adequate provocation to be an element of the separate offense of voluntary manslaughter, not a defense to second degree murder.

This conclusion is supported by the fact that the criminal code clearly identifies voluntary manslaughter as a separate offense with a less culpable mental state. Although voluntary manslaughter is defined as an "intentional or knowing killing of another" and second degree murder is defined as a "knowing killing of another," voluntary manslaughter involves a lesser degree of culpability because the killing is committed while the defendant is "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. §§ 39-13-210(a)(1), -211(a). The Sentencing Commission Comments to Code section 39-13-211 explain that "[t]he latter phrase 'irrational manner' is utilized so as to encompass a broad consideration of mental states produced by adequate provocation." This view is supported by Code section 39-11-201, which states that "[n]o person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt":

(1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;

(2) <u>The culpable mental state required;</u>

(3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and

(4) The offense was committed prior to the return of the formal charge.

<u>Id.</u> § 39-11-201. Because a person who commits the offense of voluntary manslaughter commits the offense in a state of passion produced by adequate provocation, he possesses a less culpable mental state than a person who commits the offense of second degree murder. <u>See</u> <u>State v. Dominy</u>, 6 S.W.3d 473, 477 n.9 (Tenn. 1999) (asserting that "the 'passion' language in the definition of voluntary manslaughter simply reflects a less culpable mental state than required for first or second degree murder"). A defendant who commits voluntary manslaughter has a less culpable mental state, and is, therefore, considered less blameworthy than a defendant who commits second degree murder. Thus, it is not surprising that voluntary manslaughter is punished as a Class C felony while second degree murder is punished as a Class A felony. <u>See</u> T.C.A. §§ 39-13-210(c), -211(b). Although Moore claims Code section 39-11-201(3), which states that no person may be convicted of an offense unless "[t]he negation of any defense" is "proven beyond a reasonable doubt," supports his argument, we have already concluded that the criminal code is devoid of any indication that the legislature intended state of passion to operate as a defense to second degree murder.

As to Moore's argument that voluntary manslaughter is an atypical lesser included offense because it appears to have an additional element that the greater offense does not, we note that the Tennessee Supreme Court fully addressed this scenario under subsection (b)(1) of its definition of lesser included offenses in <u>State v. Burns</u>, 6 S.W.3d 453, 466-67 (Tenn. 1999). In <u>Burns</u>, the court defined lesser included offenses as the following:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) <u>a different mental state indicating a lesser kind of culpability</u>; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67 (emphasis added); see T.C.A. § 40-18-110(g)(2) (effective July 1, 2009) (codifying that voluntary manslaughter is a lesser included offense of premeditated first degree murder and second degree murder); see also State v. Fayne, 451 S.W.3d 362, 368 n.5 (Tenn. 2014) (declining to address whether part (b) of the Burns test was superseded by Code section 40-18-110 because that determination was not required to resolve the issues); State v. John J. Ortega, Jr., No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *11 (Tenn. Crim. App. Apr. 23, 2015) (recognizing that the lesser included offenses enumerated in Code section 40-18-110(g) vary from the greater offenses "in that they involve a different mental state or involve a less serious harm or risk of harm to the victim" and concluding that only the enumerated lesser included offenses in subsection (g), which were "specifically designated by the Legislature, survive the abrogation of part (b) of the Burns test"); State v. Carlos Campbell, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *23 (Tenn. Crim. App. Oct. 20, 2015) (Agreeing with the panel's conclusion in John J. Ortega, Jr. that the 2009 amendment to Code section 40-18-110 abrogated part (b) of the Burns test), perm. app. filed, No. E2014-00697-SC-R11-CD (Tenn. Dec. 18, 2015). Regardless of whether part (b) of the Burns test is abrogated by Code section 40-18-110, voluntary manslaughter is a lesser included offense of second degree murder and contains a statutory element establishing a different mental state indicating a lesser degree of culpability.

Finally, we must also respond to Moore's claim that Khaliq Ra-El, 2014 WL 3511038, and Jeffrey Lee Mason, 2004 WL 1114581, support his view that state of passion produced by adequate provocation operates as a partial defense in a first or second degree murder prosecution. In Khaliq Ra-El, as pertinent to this case, the defendant was indicted for attempted second degree murder and was convicted of the lesser included offense of attempted voluntary manslaughter. 2014 WL 3511038, at *3. He appealed, arguing that the proof at trial was insufficient to sustain his convictions for attempted voluntary manslaughter because the State failed to prove that he either knowingly or intentionally attempted to kill the victim as a result of adequate

- 17 -

provocation. Id. This court affirmed the conviction, noting that the existence of adequate provocation is a question of fact to be decided by the jury under the facts of each case, see State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Khaliq Ra-El, 2014 WL 3511038, at *5 The court also held that the proof must support each element of the offense for which the defendant was actually convicted, see State v. Parker, 350 S.W.3d 883, 907 (Tenn. 2011), and that state of passion produced by adequate provocation is an element of voluntary manslaughter, see Williams, 38 S.W.3d at 539. Khaliq Ra-El, 2014 WL 3511038, at *5-6.

In a separate concurring opinion, Judge Witt opined that "the reference to passion and provocation in the voluntary manslaughter statue does not denote an essential element of the offense" and instead "describes a dispensation to a defendant who, having intentionally or knowingly killed another, would otherwise be guilty of first degree or second degree murder respectively." Id. at *6. Judge Witt noted that in several prior cases, the courts had upheld "voluntary manslaughter convictions against defendants' sufficiency challenges because we recognized the sophistry of requiring the State to prove the application of dispensations granted to those defendants by the legislature and a jury." Id. In an accompanying footnote, he stated: "For example, when the State charges a defendant with second degree murder, we cannot credibly expect the State to prove that the killing resulted from passion produced by adequate provocation as a means of preventing the jury from reducing the crime to reckless or negligent homicide. To require the State to do so would be to require it to disprove its charged offense." Id. at *6 n.1. In response to Judge Witt's separate concurring opinion, the majority of the panel held that "Judge Witt's separate opinion makes pertinent observations that are certainly worthy of discussion." Id. at *6. However, the majority concluded that in light of the Tennessee Supreme Court's decisions in "Parker and Williams, the final determinative discussions that would adopt Judge Witt's analysis should be made by the Tennessee Supreme Court." Id. at *6.

In Jeffrey Lee Mason, as relevant to this case, the defendant was charged with attempted first degree murder and was convicted of attempted voluntary manslaughter. 2004 WL 1114581, at *1. The defendant appealed, arguing that the proof was insufficient to support his conviction for attempted voluntary manslaughter because the State failed to prove that the attempt to kill the deputy occurred while he was in a state of passion produced by adequate provocation. Id. at *2. This court held that the jury acted within its prerogative by finding that the defendant acted in a state of passion produced by adequate provocation because the circumstances of the offense "might have been viewed by a sympathetic jury as provocative to the prisoner, at least by a subjective understanding of the term." Id. at *3 (footnote omitted). After noting that the evidence was only "marginally sufficient to support a finding of passion produced by provocation which is a necessary element of the crime of attempted voluntary manslaughter[,]" the court held that "the verdict rendered is a far more just result than an acquittal on the

lesser offense and any order for a new trial on even lesser charges." Id. As we have noted, in a related footnote, the court stated:

> This case highlights a problem that occurs because of the way our legislature has defined and our courts have typically interpreted the crime of voluntary manslaughter as a separate offense rather than a mitigated murder. Such treatment puts the state in the unusual position of trying to prove an intentional or knowing killing and at the same time trying to prove that the killing is mitigated because it was committed in a state of passion produced by adequate provocation. In a case like this, where the defendant stands charged with attempted first degree murder, a much more serious offense, the state should not be expected to prove or even try to prove that the killing was mitigated by passion produced by adequate provocation. In these cases, the burden, for all practical purposes, falls on the defendant to establish the elements of passion and provocation; that burden then shifts to the state to prove the absence of those factors. In consequence, passion and provocation most often operate as a partial defense in a first or second degree murder prosecution or, as in this case, an attempted first degree murder prosecution. That said, it is perhaps time that the law is changed to conform to the reality that occurs in the trial court.
>
> Judge Smith suggests that this might be done by considering "passion produced by adequate provocation" as a partial defense under Tennessee Code Annotated section 39-11-203(e)(1), which provides that "[a] ground of defense, other than one (1) negating an element of the offense or an affirmative defense, that is not plainly labeled in accordance with this part has the procedural and evidentiary consequences of a defense." Tenn. Code Ann. § 39-11-203(e)(1). Ultimately, however, this matter is perhaps one more appropriately resolved by the legislature than the courts.

Id. at *3 n.2.

Although cited by Moore, both Khaliq Ra-El and Jeffrey Lee Mason acknowledge that state of passion produced by adequate provocation is an element of the offense of attempted voluntary manslaughter and that the existence of adequate provocation is a question of fact to be decided by the jury under the facts of each case. Most importantly, both cases recognize that state of passion produced by adequate provocation cannot be treated as a partial defense to second degree murder unless such treatment is expressly authorized by the Tennessee Supreme Court or the legislature. For this reason, neither Khaliq Ra-El nor Jeffrey Lee Mason affords Moore relief.

**B. Tennessee Cases.** Next, Moore argues that "the appellate courts have never addressed, in binding precedent, the precise instructional interplay" between second degree murder and voluntary manslaughter. While Moore concedes that the Tennessee Supreme Court in Williams, 38 S.W.3d at 538, used the word "element" in discussing second degree murder and manslaughter, he claims that it was not clear whether the court was using the term as a general element that distinguished the offenses or as an essential element of voluntary manslaughter that must be proven beyond a reasonable doubt.

Initially, we note that the appellant courts in Tennessee have consistently held that state of passion produced by adequate provocation is an essential statutory element of the offense of voluntary manslaughter and not a mere defense to second degree murder. See Williams, 38 S.W.3d at 538 ("Comparing the revised second degree murder and voluntary manslaughter statutes, the essential element that now distinguishes these two offenses (which are both "knowing" killings) is whether the killing was committed "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."); State v. Sentorya L. Young, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *4 (Tenn. Crim. App. May 12, 2008) ("The lesser charge of voluntary manslaughter also includes the 'knowing killing of another,' but adds the additional element that the killing was done 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'"), perm. app. denied (Tenn. Dec. 8, 2008); State v. Devin Banks, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *32 (Tenn. Crim. App. July 6, 2007) ("The elements which distinguish voluntary manslaughter from either first or second degree murder are those of 'adequate provocation' and the 'state of passion.'"); State v. Larry Allen Whited, No. M2005-00167-CCA-R3-CD, 2006 WL 548228, at *9 (Tenn. Crim. App. Mar. 7, 2006) ("The lesser charge of voluntary manslaughter also includes the 'knowing killing of another,' but adds the additional element that the killing was done 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'"), perm. app. denied (Tenn. Aug. 28, 2006); State v. Al M. Williams, No. W2004-01679-CCA-R3-CD, 2006 WL 236936, at *5 (Tenn. Crim. App. Jan. 30, 2006) (While second degree murder and voluntary manslaughter are "knowing" killings, "[v]oluntary manslaughter is a lesser-included crime of second degree murder that involves the mitigating elements of the defendant's 'state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'"), perm. app. denied (Tenn. June 12, 2006); State v. Brian J. Hunter, No. 02C01-9708-CR-00309, 1998 WL 473887, at *3 (Tenn. Crim. App. Aug. 14, 1998) (The "additional element of passion produced by adequate provocation reduces second degree murder to voluntary manslaughter, even though all elements of second degree murder have been met.").

Moore also argues that State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), provides no guidance as to the instructional interplay between second degree murder and voluntary manslaughter as it relates to his case. While acknowledging that this court in

Page provided what it believed to be the "proper jury charges" on premeditated first degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide, Moore claims these jury instructions, which were unexplained, did not establish binding precedent because neither party in Page raised issues regarding the jury instructions. Id. at 790-93 (appendix). Noting that the Tennessee Supreme Court has never adopted or even discussed the instructions recommended in Page, Moore contends that the "unbriefed dictum in Page, incorporated into the pattern instructions, . . . now driv[es] how juries are instructed in hundreds of cases in this state." As support for his claim that state of passion should be treated as a defense, Moore cites several cases suggesting that the absence of state of passion must be proven in order to obtain a conviction for attempted second degree murder. See State v. Albert James Saavedra, No. M2004-02889-CCA-R3-CD, 2006 WL 618299, at *25 (Tenn. Crim. App. Mar. 13, 2006), perm. app. denied (Tenn. Aug. 21, 2006); State v. Joey Dewayne Thompson, No. E2003-00569-CCA-R3-CD, 2004 WL 1592817, at *6 (Tenn. Crim. App. July 16, 2004); State v. Andrew Cole, No. 02-C01-9712-CC-00461, 1998 WL 651654, at *3 (Tenn. Crim. App. Sept. 24, 1998); State v. Melvin Edward Henning, No. 02C01-9703-CC-00126, 1997 WL 661455, at *4 (Tenn. Crim. App. Oct. 24, 1997); State v. Tracy Lamar Belle, No. 03C01-9503-CR-00094, 1996 WL 102347, at *1 (Tenn. Crim. App. Mar. 6, 1996), perm. app. denied (Tenn. Sept. 16, 1996).

Though Moore claims that the jury instructions in his case were the same as the recommended jury instructions in Page, a careful review of both sets of instructions leads us to conclude that they were not identical. In Moore's case, unlike in Page, the trial court distinguished the offenses of voluntary manslaughter and second degree murder not only in the section of the instructions defining the offense of voluntary manslaughter but also in the section defining the offense of second degree murder, which is in accordance with the applicable Tennessee Pattern Jury Instructions. In each section, the trial court included the following language:

> The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a) and 7.06 (16th ed. 2012).

Because the trial court included the aforementioned language in the sections defining second degree murder and voluntary manslaughter, the instructions in Moore's case provided clarity that was lacking in the recommended instructions in Page. The jury in Moore's case was informed of the differences between second degree murder and voluntary manslaughter at the moment when they were considering whether Moore was guilty of second degree murder. For this reason, Moore's argument that the sequential

jury instructions in his case prevented the jury from ever finding him guilty of voluntary manslaughter is unpersuasive.

**C. Whether the Instructions were Prejudicially Erroneous.** Moore also argues that the instructions in his case were prejudicially erroneous. A defendant in a criminal case has a constitutional right to a correct and complete charge of the law, so that each issue of fact raised by the proof will be submitted to the jury on proper instructions. State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citing State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). It follows then that trial courts have a duty in criminal cases to instruct the jury on the law applicable to the facts of a case. State v. Clark, 452 S.W.3d at 294-95 (Tenn. 2014) (citing State v. Thompson, 285 S.W.3d 840, 842 n.1 (Tenn. 2009); Burns, 6 S.W.3d at 464). A trial court's instructions "must describe and define each element of the offense or offenses charged." Id. at 295 (citing Faulkner, 154 S.W.3d at 58; State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989)). The sufficiency of jury instructions is a question of law that this court must review de novo with no presumption of correctness. Id. (citing State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013); Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 699 (Tenn. 2011)).

When reviewing challenged jury instructions, this court must "view the instruction in the context of the charge as a whole" in determining whether prejudicial error has been committed requiring reversal. Id. (citing State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008); State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). An instruction is prejudicially erroneous when "the instruction alone infected the entire trial and resulted in a conviction that violates due process," see State v. James, 315 S.W.3d 440, 446 (Tenn. 2010), or "when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law," see State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010)). Id.

We conclude that the jury instructions regarding second degree murder and voluntary manslaughter fairly submitted the legal issues and contained a proper statement of the applicable law. The instructions given were substantively the same as the instructions suggested in the appropriate pattern instructions. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a) and 7.06 (16th ed. 2012). This court has consistently upheld the Tennessee Pattern Jury Instruction's method of setting out the elements of second degree murder and voluntary manslaughter and distinguishing the two offenses, and the Tennessee Supreme Court has repeatedly denied permission to appeal on this issue. See State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *16 (Tenn. Crim. App. Mar. 9, 2011), perm. app. denied (Tenn. Aug. 25, 2011); State v. Mark Hines, No. W2009-00450-CCA-R3-CD, 2010 WL 4286132, at *10 (Tenn. Crim. App. Oct. 27, 2010), perm. app. denied (Tenn. Apr. 14, 2011); State v. Billie Joe Welch, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App. Sept. 26, 2006), perm. app. denied (Tenn. Feb. 26, 2007). We also conclude that the instructions,

which advised the jury as to the issue of passion upon adequate provocation in the description of second degree murder, did not alone infect the entire trial or result in a conviction that violated due process. Consequently, we conclude that the jury instructions in Moore's case were not prejudicially erroneous.

**D. <u>Relief Pursuant to Mullaney and Patterson.</u>** Finally, Moore argues that the jury instructions given in this case violated his due process rights based on the United States Supreme Court's rulings in <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975), and <u>Patterson v. New York</u>, 432 U.S. 197 (1977). He claims that following <u>Mullaney</u> and <u>Patterson</u>, the State was required to prove facts that are "intrinsically and historically part of the charged crime." While Moore acknowledges that treating state of passion as an affirmative defense was upheld in <u>Patterson</u>, he asserts that requiring him to prove the defense of state of passion beyond a reasonable doubt violates his due process rights. We conclude that the jury instructions in Moore's case did not violate his due process rights and that neither <u>Mullaney</u> nor <u>Patterson</u> entitle him to relief.

In <u>Mullaney</u>, the United States Supreme Court considered whether a Maine law, which required a defendant charged with murder to prove by a preponderance of the evidence that he acted "in the heat of passion on sudden provocation" to reduce murder to manslaughter, violated due process. 421 U.S. at 703. The Maine law allowed the State to rest on a presumption of implied malice aforethought and required the defendant to prove he had acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. <u>Id.</u> at 688. The Court noted that "[u]nder this burden of proof a defendant can be given a life sentence when the evidence indicates that it is as likely as not that he deserves a significantly lesser sentence[,]" which was "an intolerable result in a society where . . . it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter." <u>Id.</u> at 703-04. Consequently, the Court held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." <u>Id.</u> at 704.

In <u>Patterson</u>, the United States Supreme Court determined whether a New York State statute, which required the defendant in a murder prosecution to prove the affirmative defense of extreme emotional disturbance by a preponderance of the evidence in order to reduce murder to manslaughter, violated due process. 432 U.S. at 198-200. The Court held that such an affirmative defense does not serve to negate any facts of the offense which the State must prove in order to convict of murder but instead constitutes a separate issue on which the defendant must carry the burden of persuasion. <u>Id.</u> at 206-07. The Court declined to adopt a rule requiring the State to disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to a defendant's culpability. <u>Id.</u> at 210. It held that "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here." <u>Id.</u>

- 23 -

Neither <u>Mullany</u> nor <u>Patterson</u> lead us to conclude that Moore's due process rights were violated by the jury instructions given in his case. The laws in each of those cases were substantively different from the current Tennessee statutes defining second degree murder and voluntary manslaughter. As we have previously noted, the Tennessee legislature intended for state of passion produced by adequate provocation to be an element of the crime of voluntary manslaughter that must be proven by the State beyond a reasonable doubt. Because the jury instructions in this case reflect this legislative intent, we conclude that the instructions did not violate Moore's due process protections.

**II. <u>State of Passion Element had to be Proven by the State.</u>** Moore contends that the trial court erred in instructing the jury it must determine whether the State has proven the existence of the element of state of passion beyond a reasonable doubt. He notes that in most cases, as in his case, the State vigorously argues against the existence of state of passion in order to obtain a conviction for second degree murder. Based on the instructions given in his case, he claims the jury was never asked to determine whether the defense had succeeded in raising doubt or had successfully proved that he was acting in a state of passion and instead was asked only whether <u>the State</u> had proven the provocation element. He adds that because the jury instructions required the State to prove the element of state of passion beyond a reasonable doubt, the instructions violated his constitutional right to present a defense.

The trial court provided the following jury instruction for the offense of voluntary manslaughter, in pertinent part: "For you to find the defendant guilty of [voluntary manslaughter], the state must have proven beyond a reasonable doubt the following essential elements," which included the element that "the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

Moore claims that this instruction, which required the State to prove state of passion beyond a reasonable doubt, prevented the jury from considering proof offered by him on the issue of whether he was guilty of second degree murder or voluntary manslaughter. <u>See</u> <u>State v. Kizer</u>, 284 S.W.3d 227, 272 (Tenn. 2009) (reiterating that "[t]he jury is presumed to follow its instructions"). He asserts that he is entitled to a new trial because the jury instructions prevented the jury from fully considering the most important evidence, the proof he offered regarding his state of passion at the time of the offenses.

Initially, we recognize that defendants, with the goal of being convicted of a lesser included offense, routinely present evidence that contests the State's proof of mens rea for the charged offense. <u>See, e.g.</u>, <u>State v. Curtis Moore</u>, No. W2013-00179-CCA-R3-CD, 2014 WL 465751, at *9 (Tenn. Crim. App. Feb. 4, 2014), <u>perm. app. denied</u> (Tenn. June 24, 2014) (stating that the defendant argued "he did not have the requisite <u>mens rea</u> because he did not knowingly commit this crime but rather committed the shooting in a

- 24 -

state of passion"). As we noted in the previous section, "[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required . . . is proven beyond a reasonable doubt[.]" See T.C.A. § 39-11-201(a)(2); see also State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994) ("While the law presumes sanity it does not presume mens rea. Due process requires that the government prove every element of an offense beyond a reasonable doubt."). Because the mental state required for an offense must be proven beyond a reasonable doubt, "evidence tending to make the existence of that mental state 'more probable or less probable' is relevant" and admissible and "[t]o find otherwise would deprive a criminal defendant of the right to defend against one of the essential elements of every criminal case." Phipps, 883 S.W.2d at 149 (quoting Tenn. R. Evid. 401) (citing Tenn. R. Evid. 402). Moreover, the State may utilize evidence of state of passion offered by the defense when proving the offense of voluntary manslaughter. See T.C.A. § 39-11-201(d) ("Evidence produced at trial, whether presented on direct or cross-examination of state or defense witnesses, may be utilized by either party."). Although defendants often employ the strategy of presenting evidence to challenge the State's proof of mens rea for the charged offense, the law in Tennessee is clear that voluntary manslaughter is a separate criminal offense and that the State bears the burden of proving the defendant's mental state for this offense beyond a reasonable doubt.

Citing Khaliq Ra-El, Moore argues that it is error to instruct the jury that the State must prove the existence of the element of state of passion beyond a reasonable doubt when in most cases, as in his case, the State vigorously argues against the existence of state of passion in order to obtain a conviction for second degree murder. As we previously noted, the majority in Khaliq Ra-El held that in light of the Tennessee Supreme Court's opinions in Parker and Williams, "the final determinative discussions that would adopt Judge Witt's analysis should be made by the Tennessee Supreme Court." Khaliq Ra-El, 2014 WL 3511038, at *6.

While Moore asserts that it is irrational to expect the State to present proof of adequate provocation when it could damage its case for second degree murder, we have noted that the defendant has the right to present evidence challenging the State's proof of mens rea for the charged offense. Although a defendant may choose to present evidence of state of passion produced by adequate provocation, which indicates a lesser degree of culpability, in order to obtain a conviction for voluntary manslaughter, the State bears the burden of proving the mental state for the charged offense and any lesser included offenses. Therefore, we conclude that the trial court's instruction, which properly placed the burden of proof on the State to prove the elements of voluntary manslaughter, was not in error.

**III.    Sequential Jury Instructions.**    Moore argues that sequential jury instructions, like those given in his case, prevent a jury from ever returning a verdict of voluntary manslaughter. See Falconer v. Lane, 905 F.2d 1129, 1136-37 (7th Cir. 1990) (holding that the petitioner was entitled to federal habeas corpus relief because the jury

instruction, which left the jury with a false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction, violated due process and concluding that the error was not harmless); Fincham v. State, 427 S.W.3d 643, 649-50 (Ark. 2013) (holding that the acquittal first jury instructions for the lesser included offense of extreme-emotional-disturbance manslaughter offense improperly precluded the jury from considering whether the defendant was guilty of manslaughter unless it had reasonable doubt as to either first- or second-degree murder). He claims the jury instructions in his case denied his right to a fair trial.

Moore asserts that the jury instructions in this case defined second degree murder as having two elements, (1) an unlawful killing, and (2) knowing, and defined voluntary manslaughter as having the two aforementioned elements plus the additional element of (3) state of passion. Moreover, the instructions stated that voluntary manslaughter was a lesser offense of second degree murder and that the jury was permitted to consider lesser included offenses only if there was a unanimous decision that the defendant was not guilty beyond a reasonable doubt of the greater offense. Although Moore acknowledges that the jury instructions given in his case differentiated the offenses of second degree murder and voluntary manslaughter, he contends that the jury was given no instructions regarding "how to square that information with the specific and mandatory acquittal-first instruction that came after the trial court's distinction between second degree murder and voluntary manslaughter. He adds that "[t]he jury is never told how or whether the distinction between the two offenses supersedes the acquittal-first instruction." Consequently, he claims that the jury would have had to find that he was not guilty of second degree murder before it was allowed to decide whether he was guilty of voluntary manslaughter.

Moore admits that sequential jury instructions have been repeatedly upheld. However, he asserts that this court "has never, in a published opinion, addressed the nonsensical result that a jury, following the sequential instructions, can never properly convict of voluntary manslaughter, as it will always return a verdict of guilty of second-degree murder, or not guilty of both offenses." He asserts that State v. Davis, 266 S.W.3d 896 (Tenn. 2008), cannot be interpreted as ruling on the issue of "whether jury instruction[s] are prejudicially erroneous when they combine an acquittal-first instruction with a definition of voluntary manslaughter as having the same elements as second-degree murder plus an additional element." Moore claims that because voluntary manslaughter is not a lesser included offense of murder under the elements test but is a lesser included offense pursuant to statute, Davis fails to address the scenario present in his case. See id. at 904 n.8 (stating that a jury considering the greater offense necessarily considers all applicable lesser included offenses supported by the proof, at least in a situation in which the statutory elements of the lesser included offense are included within the statutory elements of the charged offense as described in the first of the three categories of lesser included offenses outlined in Burns, 6 S.W.3d at 466-67).

Moore cites to Judge Tipton's concurrence in State v. Earnest Gwen Humphrey, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778, at *14-15 (Tenn. Crim. App. Aug. 24, 2005), perm. app. denied (Tenn. Feb. 6, 2006), to support his claim that the jury instructions in his case were erroneous because the jury was not required to simultaneously consider second degree murder and voluntary manslaughter before rendering its verdict. In Earnest Gwen Humphrey, the defendant argued that the jury instructions were erroneous because they instructed the jury not to consider voluntary manslaughter until it first acquitted the defendant of second degree murder. Id. at *14. The majority of the panel concluded that the trial court did not err in giving the sequential jury instructions because they did not preclude the jury from considering the lesser charges. Id. (citing State v. Raines, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994); State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997) (appendix)).

However, in a separate concurrence, Judge Tipton asserted that "[t]he danger arising from instructing the jury that it must consider and acquit for second degree murder before considering voluntary manslaughter is that the jury is barred from considering the significance of passion relative to the issue of second degree murder versus voluntary manslaughter." Id. at *15. He noted that similar sequential instructions had been held to be a due process violation. Id. (citing Falconer, 905 F.2d at 1137; Edge v. State, 414 S.E.2d 463, 466 (Ga. 1992)). While acknowledging that "binding precedent in Tennessee allows for the sequential offense consideration instruction," he emphasized that "we should not ignore the potential risk created by the instruction." Id. Judge Tipton offered the following remedy:

> When evidence justifies an instruction on voluntary manslaughter, the trial court should instruct the jury so as to ensure adequate consideration of both second degree murder and voluntary manslaughter. That is, if a sequential offense consideration instruction is given, the instruction dealing with second degree murder should also advise the jury relative to the issue of passion upon adequate provocation relative to voluntary manslaughter. Such an instruction is contained in T.P.I–Crim. 7.05(a) (8th ed. 2004), which provides after stating the elements of second degree murder:
>
> > The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Id. Judge Tipton observed that this recommended instruction was not given by the trial court in the Earnest Gwen Humphrey case and urged the trial court to use the Tennessee Pattern Jury Instruction in the future. Id.

Significantly, the instruction recommended by Judge Tipton in Earnest Gwen Humphrey was used in Moore's case. As we previously noted, the jury instructions on the offenses of second degree murder and voluntary manslaughter were substantially in accordance with the Tennessee Pattern Jury Instructions 7.05(a) and 7.06 because they included the language distinguishing the offenses of voluntary manslaughter and second degree murder after defining the elements of both offenses. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a) and 7.06 (16th ed. 2012). While this court has consistently upheld sequential jury instructions that place the distinction between second degree murder and voluntary manslaughter behind the voluntary manslaughter charge, it has concluded that "the better practice is to adhere to the approach in the Tennessee Pattern Jury Instruction which provides the distinction between second degree murder and voluntary manslaughter in the instruction for second degree murder." See Chris Jones, 2011 WL 856375, at *16; see also Mark Hines, 2010 WL 4286132, at *10; Billie Joe Welch, 2006 WL 2737830, at *14; Earnest Gwen Humphrey, 2005 WL 2043778, at *14-15 (Tipton, J., concurring). Because the jury instructions in this case distinguishing the offenses of second degree murder and voluntary manslaughter after defining the elements of both offenses, Moore's claim that the jury instructions prevented the jury from returning a verdict of voluntary manslaughter is unpersuasive.

Finally, despite Moore's arguments to the contrary, we do not find the cases of Falconer, 905 F.2d at 113667, and Fincham, 427 S.W.3d at 649-50, to be helpful in determining whether the jury instructions in this case was erroneous. Those cases are not sufficiently similar to the instant case to provide any beneficial insight. Because the trial court in Moore's case used the pattern instructions, which informed the jury of the distinction between voluntary manslaughter and second degree murder at the time that they were deliberating whether to find Moore guilty of second degree murder, we conclude that the instructions were proper.

**IV. Admission of Testimony regarding Moore's prior death threat to Amber Snellings.** Moore asserts that the trial court should not have admitted Courtney Roach's testimony about his alleged death threat to Amber Snellings because he was unable to fully impeach Roach without admitting evidence of other threats he allegedly made. He explains that although Roach told the detectives of several threats Moore had made against Snellings and White, which were ruled inadmissible by the trial court, she never told the detectives that she personally observed Moore's threat to kill Snellings at his wife's apartment on March 31, 2012. Although Moore chose to forego a full impeachment of Roach, choosing instead to emphasize Roach's failure to inform the police of the death threat to Snellings, he claims the trial court should not have admitted Roach's testimony regarding the "late remembered threat" to Snellings because that evidence was unfair and likely to mislead the jury pursuant to Tennessee Rule of Evidence 403. He also asserts that admission of this evidence violated his right to due process and to effective cross-examination under the Sixth and Fourteenth Amendments and was not harmless because the State relied heavily on this evidence at trial.

Before trial, the defense filed a motion in limine to exclude testimony from Courtney Roach about various threats Moore had made to Snellings and White that Roach had heard about from other people and about Moore's assault on White that Roach personally observed. At a pre-trial hearing, the State argued that it should be allowed to introduce testimony from Roach regarding two incidents she personally witnessed between Moore and the victims. The first incident involved Moore striking his wife, and the second incident involved Moore threatening to kill Snellings, which Roach did not report to detectives investigating the case. At the hearing, Moore objected to the admission of the testimony regarding the assault of his wife pursuant to Rule 404(b), and the trial court excluded this evidence on that basis. As to the second incident, Roach testified that in the late hours of March 31, 2012, or the early hours of April 1, 2012, Moore threatened to kill Snellings. She said that during this incident Moore called Snellings a "bitch and a cunt" and told her that she "broke up a happ[y] marriage and broke up a family" before barging out of the door to the apartment. On cross-examination, Roach admitted that when she spoke to a detectives approximately ten days after the murders, she recounted some threats Moore had made to the victims that were observed by other people but did not disclose Moore's death threat to Snellings that she personally observed. The defense then introduced the recording of Roach's interview with the detectives. After presenting this proof, Moore argued that the trial court should exclude the evidence of his death threat to Snellings under Rule 403 because the probative value of the evidence was substantially outweighed by unfair prejudice. He claimed that because the threats that Roach had actually disclosed to the detectives had been ruled inadmissible, he would be unable to properly impeach Roach about her failure to disclose the death threat to Snellings without opening the door to the other evidence that had been ruled inadmissible. Moore also argued that this evidence should be excluded because to do otherwise would prevent him from defending himself at trial. At that point, the State asserted, and the defense acknowledged, that the recording would show that Roach did inform the detectives that Moore cursed Snellings but did not disclose that Moore threatened to kill Snellings. The State claimed that Roach's failure to disclose Moore's death threat to Snellings would affect her credibility but not the admissibility of the death threat.

The trial court initially considered the admissibility of the evidence under the Rule 404(b) standard. It held that the material issue that existed other than conduct conforming with a character trait was intent, given that the State had charged Moore with premeditated killings. The court also found that the proof of Moore's death threat to Snellings was clear and convincing. After finding that "a prior death threat is highly probative of [premeditation] and is "so probative [that] it outweighs the danger of any unfair prejudice to the defendant," the trial court ruled Roach's testimony regarding the death threat to be admissible. In its ruling, the trial court noted that the detectives had not specifically asked Roach about any threats Moore may have made to Snellings and concluded that Roach's testimony about the death threat was credible. The defense again claimed the trial court's ruling violated Rule 403 and Moore's right to a fair trial because

it prevented the defense from properly impeaching Roach about her disclosure of the other threats that had been ruled inadmissible. The trial court responded that while it understood the defense's dilemma, it believed that the defense had ample room to cross-examine Roach about her late disclosure of Moore's death threat to Snellings just prior to trial, which overcame any Rule 403 exclusion.

At trial, Roach provided substantially the same testimony regarding Moore's death threat to Snellings. The defense extensively cross-examined Roach regarding her failure to disclose this death threat to the detectives in the days following the victims' murders. Roach admitted that she had not disclosed Moore's death threat against Snellings, even though one of the detectives had asked her if she had ever heard Moore saying, "I'm going to kill you[.]" She also admitted that she did not disclose the death threat despite the fact that she knew the detectives were interested in hearing about Moore's threats to the victims. The defense presented testimony at trial from Alan McFarland, White's father, who stated that White had told him about the incident involving Moore and Snellings but had never mentioned that Moore made any death threats that day.

We review the trial court's denial of a motion in limine to restrict the admission of evidence under an abuse of discretion standard. See State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004); see also State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) ("Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record."). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

Courts have routinely allowed the use of evidence of a homicide defendant's threats against a homicide victim as a means of allowing the State the opportunity to prove motive and intent. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008). Evidence of this type is probative of the defendant's mens rea at the time of the crime because it reveals the defendant's "settled purpose" to harm the victim. See Smith, 868 S.W.2d at 574; Gilley, 297 S.W.3d at 758.

Although Moore argues that the trial court should have excluded this evidence under Rule 403, we conclude that the trial court properly applied the more stringent standard of Rule 404(b) because the evidence at issue reflected upon Moore's character. See State v. James, 81 S.W.3d 751, 758 (Tenn. 2002) (citing State v. DuBose, 953 S.W.2d 649, 655 (Tenn. 1997)); see also W. MARK WARD, TENNESSEE CRIMINAL TRIAL PRACTICE § 22:24 (2015-2016 ed.) (noting that the standard in Rule 404(b) is "weighted more toward exclusion than Rule 403"). At trial, Moore testified that he never threatened

to kill Snellings, that he never planned to kill any of the victims, and that he never remembered fatally shooting Snellings. In considering whether the trial court abused its discretion in admitting this evidence, we agree that the probative value of Moore's death threat against Snellings was not outweighed by the danger of unfair prejudice because such evidence was probative of Moore's intent to kill Snellings. The defense at trial extensively cross-examined Roach about her failure to disclose Moore's death threat. Roach admitted that she had failed to divulge Moore's death threat against Snellings even though the detectives had asked her if she had heard Moore making any threats. In light of Roach's admission, the defense would not have gained anything from having Roach testify about Moore's other threats that had been ruled inadmissible. While the defense could have asked Roach about Moore's other threats and requested a curative instruction to the jury that the evidence was to be used only for the purpose of impeachment and not as substantive evidence of the truth of the matter asserted, Moore's attorneys made a strategic decision to not ask Roach about these other threats so that they could keep this evidence from the jury. Under these circumstances, we cannot conclude that the trial court abused its discretion in admitting this evidence.

**V.   Sufficiency of the Evidence.**   Moore argues that there was insufficient evidence to sustain his convictions for second degree murder and that his conviction should be reduced to voluntary manslaughter. He claims that regardless of whether state of passion is interpreted as a defense that must be disproven beyond a reasonable doubt or as an element that must be proven beyond a reasonable doubt, the evidence in his case did not establish "any plan, any intention, or even any knowledge."

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing Majors, 318 S.W.3d at 857). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Parker, 350 S.W.3d at 903 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting State v. Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all

conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

Moore argues that he should have been convicted of voluntary manslaughter rather than second degree murder. Second degree murder is defined as a "knowing killing of another." T.C.A. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). On the other hand, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a).

Although Moore claims that the evidence presented at trial established adequate provocation, the proof, when viewed in a light most favorable to the State, shows that Moore knowingly killed his wife, her twin sister, and his wife's lover and did not kill these victims in a state of passion produced by adequate provocation. At trial, Moore admitted that he killed all three victims. The proof showed that White and Snellings had been having an affair and that Moore had known about the affair for several weeks at the time of the killings. On March 31, 2012, the day of Moore's and White's second wedding anniversary, White left their date early and returned to her apartment to see Snellings. When Moore got to the apartment, he found his wife in a bedroom with Snellings and threatened to kill Snellings for ruining his marriage. The same day, Moore purchased the murder weapon. Less than one month later, he completed an application for a permit to carry a concealed weapon. Moore and White later reconciled. On May 21, 2012, the day of the killings, a GPS tracking device on Moore's company vehicle established that he left his regular route to stop at his apartment. Text messages between White and Snellings showed that Snellings was with White at the time Moore stopped by the apartment. Moore testified that he saw Stagnolia leaving the apartment in a car that he believed belonged to Snellings. Based on this evidence, a rational jury could have found that Moore knew Snellings was at his apartment when he returned to work. Moore left work at 2:03 p.m. that day.

Moore testified that he killed the victims in a state of passion produced by adequate provocation after discovering all three women engaged in sexual activity. He stated that after making this discovery, he got his gun with the intent to commit suicide but shot his wife when she confronted him on the staircase. Moore said that he did not remember shooting Snellings and that he shot Stagnolia, his wife's sister, when she confronted him

- 32 -

at the back door as he was fleeing. Although Moore claimed he killed the victims in a state of passion, the evidence from the crime scene does not support Moore's version of events. Moore testified that just prior to the killings, the victims were undressed and engaged in sexual activity. However, the evidence at the scene established that all three victims were fully clothed at the time of their death and were killed in three separate areas of the apartment. No DNA evidence supported Moore's claim that the victims were engaged in sexual activity just prior to the killings. Downstairs, officers found a half-full plate of pizza rolls, a package of cigarettes, and an ashtray next to a partially completed puzzle. In the upstairs bedroom, where the alleged sexual activity took place, officers found only the body of Snellings along with a full glass of tea with ice still present in the glass.

Despite Moore's claim that he killed the victims in a state of passion, the bulk of the evidence presented at trial indicated that he committed a knowing killing. Moore himself admitted that he considered a plan of action after discovering his wife with Snellings and made a decision to obtain his gun. He said that he had been trained not to remove the safety from his gun until he intended to use it and that he removed the safety when he took it out of his holster. While Moore claimed that he killed the victims after discovering all three women engaged in sexual activity, he conceded that he had found his wife engaged in sexual activity with Snellings on a prior occasion. He also admitted knowing that his wife's affair with Snellings had not ended after he and his wife reconciled. Moore testified that he stopped at his apartment earlier that day because he suspected that Snellings was present and returned there later because he believed "something wasn't right."

The victims' injuries were also consistent with knowing killings. Moore shot his wife and Stagnolia in the forehead before shooting them again in the back of the head as they were lying on the ground. He shot Snellings three times as she was lying in bed. Moore killed all three victims in the span of a few minutes. The proof showed that Snellings concluded a phone call at 2:13 p.m., and only twenty-three minutes later, Moore had fatally shot all three victims and was driving toward his brother's home. Based on this evidence, a rational jury could have found beyond a reasonable doubt that Moore committed knowing killings rather than killings due to adequate provocation. See Williams, 38 S.W.3d at 539 (stating that the jury's decision to reject the notion of provocation was well within its prerogative); Johnson, 909 S.W.2d at 464 ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury.").

Lastly, Moore claims that unless State v. Thornton, 730 S.W.2d 309 (Tenn. 1987) is overruled by the Tennessee Supreme Court, this court must reduce his convictions for second degree murder to voluntary manslaughter because he acted in a state of passion produced by adequate provocation when he committed these offenses. He claims that like Thornton, he and his wife were separated after being married for a few years, he and

his wife were attempting to reconcile, he became suspicious when he saw a strange automobile outside his home, and he discovered his wife in the midst of sexual activity, which provided adequate provocation for him to fatally shoot the victims.

We conclude that State v. Thornton is inapplicable to this case. In Thornton, the defendant was convicted of murder in the first degree after shooting his wife's paramour, a complete stranger, on May 3, 1983. Id. at 309. In that case, the defendant discovered his wife and the victim engaged in sexual relations in a bedroom in the defendant's home. Id. at 311. He fired one shot that struck the victim in his left hip, and the victim died sixteen days later when the bullet wound became infected. Id. at 312. The court, in considering whether the evidence supported a conviction of murder in the first degree, held that the required elements of malice and premeditation were not established and that the defendant acted under legally sufficient provocation before reducing the conviction offense to voluntary manslaughter and remanding the case to the trial court for resentencing. Id. at 315. At the time of the offense in Thornton, malice was required for a conviction for murder in the first or second degree and manslaughter was defined in Code section 39-2-221 as "the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act." Id. at 312 n.1 (citing T.C.A. § 39-2-221).

Thornton is factually and legally distinct from Moore's case. In Thornton, the wife admitted that she was engaged in sexual relations with the victim at the time of the crime. See id. at 309. However, in this case, the only proof that Moore discovered his wife engaged in sexual activity with Snellings and Stagnolia, his wife's twin, came from his own testimony, and the bulk of the physical evidence at the crime scene did not support Moore's claim. By its verdict, the jury chose to discredit Moore's testimony. Factual discrepancies aside, the applicable law in Moore's case is substantially different from the law in Thornton. As we have recognized, the 1989 revisions to the code removed malice as an element of second degree murder. See T.C.A. § 39-13-210. Because the proof in this case overwhelmingly establishes that Moore knowingly killed the victims and did not kill them in a state of passion produced by adequate provocation, we conclude that the evidence is sufficient to sustain Moore's three convictions for second degree murder.

**VI.  Sentencing.**  Moore contends that the trial court abused its discretion in determining that he was a dangerous offender before sentencing him to partially consecutive sentences. First, he disputes the trial court's finding that his crime was "a clear, calculated execution" given that the jury acquitted him of first degree premeditated murder. Second, he contends that the evidence failed to show that consecutive sentencing was "necessary in order to protect the public from further criminal acts," which is the second of the two additional findings that must be made under the "dangerous offender" category. See State v. Pollard, 432 S.W.3d 851, 863 (Tenn. 2013).

Pursuant to the 2005 amendments, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1)     The evidence, if any, received at the trial and the sentencing hearing;

(2)     The presentence report;

(3)     The principles of sentencing and arguments as to sentencing alternatives;

(4)     The nature and characteristics of the criminal conduct involved;

(5)     Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40 35 113 and 40 35 114;

(6)     Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7)     Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts.

In Pollard, the Tennessee Supreme Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." 432 S.W.3d at 860; see State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that the presumption of reasonableness "giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. It reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure

necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), (4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court imposed consecutive sentencing after finding that Moore was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See T.C.A. § 40-35-115(b)(4). The Pollard court explained that the record must support two additional findings before the dangerous offender classification can be applied:

> "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (emphasis added) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). In other words, the record must show that "the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" Id. (quoting Wilkerson, 905 S.W.2d at 938); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999) (stating that the need for the trial court to make additional findings before imposing consecutive sentences pursuant to this factor stems from the fact that the dangerous offender category "is the most subjective and hardest to apply").

At the end of the hearing, the trial court held that Moore was a Range I offender. It noted that when determining the sentence length, it must also consider whether the sentences will be served concurrently or consecutively. The trial court agreed that the only possible consecutive sentencing factor applicable to this case was the dangerous offender classification, which involved consideration of the Wilkerson factors.

In considering the first factor, whether the aggregate sentence reasonably related to the severity of the offenses, the trial court found that the circumstances surrounding the offenses were extremely aggravated because Moore systematically "executed" the women in three different locations in the apartment. It said that despite Moore's claim

that the victims were all engaged in sexual activity in the upstairs bedroom, Snellings was the only person shot in that bedroom, and the other victims were shot in different locations on the first floor. It added that Moore shot each of the victims at least once before giving them "an insurance round."

When considering the second factor, whether the sentencing terms imposed were necessary in order to protect the public from further criminal acts by the offender, the trial court noted that prior to this case, Moore had never been charged with a criminal offense. It recognized the defense's argument that Moore had committed these offenses in response to an unusual set of circumstances that were unlikely to reoccur. Nevertheless, the trial court found that Moore's execution of the victims, including Stagnolia who appeared to be innocent of any wrong-doing, established that he was a danger to the public because he was capable of killing innocent individuals when "set off." After concluding that the record supported the two additional findings required in Wilkerson, the trial court applied the dangerous offender classification for consecutive sentencing. The court sentenced Moore in each of the three counts to the minimum sentence of fifteen years but held that an effective forty-five-year sentence was inappropriate in this case. See T.C.A. §§ 40-35-112(a)(1), -115. Instead, it ordered the sentences for the murders of White and Snellings served concurrently with one another and ordered the sentence for the murder of Stagnolia served consecutively to these sentences, for an effective sentence of thirty years with a release eligibility of one hundred percent.

First, Moore claims the trial court abused its discretion in applying the dangerous offender classification after finding that he committed "a clear, calculated execution" when the jury acquitted him of first degree premeditated murder in each of the three counts. Although he acknowledges the Tennessee Supreme Court's ruling in Winfield, Moore claims that this ruling does not justify the trial court's decision "to re-characterize the crime and to sentence [him] as if he had been convicted of first degree murder."

In Winfield, the defendant was charged with one count of aggravated assault by use of a deadly weapon and one count of assault but was convicted two counts of assault. State v. Winfield, 23 S.W.3d 279, 281 (Tenn. 2000). When the defendant appealed his sentence, the Tennessee Court of Criminal Appeals determined that two of the four enhancement factors applied by the trial court were improper but affirmed the defendant's sentence after finding an enhancement factor that had not been applied by the trial court, namely that the defendant possessed or employed a deadly weapon during the offense. Id. at 280. The defendant then appealed to the Tennessee Supreme Court, arguing that the Court of Criminal Appeals erroneously applied an enhancement factor based upon facts underlying the offense of aggravated assault, of which the defendant was acquitted. Id. In considering this issue, the Tennessee Supreme Court held that "a sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in

the record by a preponderance of the evidence." Id. at 283 (footnote omitted). However, it noted under the particular circumstances of that case, the Court of Criminal Appeals "erred in applying the deadly weapon enhancement factor absent specific factual findings made by the trial court" that resolved conflicts in the evidence and made credibility determinations. Id. at 284.

Obviously, the application of the dangerous offender factor in this case varies substantially from the application of the deadly weapon factor in Winfield. Nevertheless, the trial court in this case provided voluminous factual findings as to why it believed that killings in this case were systematic executions. The trial court implicitly found that Moore's testimony was not credible after noting that the evidence from the crime scene did not support Moore's version of events. In light of these extensive factual findings, we conclude that the trial court did not abuse its discretion in applying the dangerous offender classification in this case. We also conclude that the dangerous offender factor was certainly applicable to Moore's three convictions for second degree murder and was established in the record by a preponderance of the evidence.

Second, Moore contends the trial court abused its discretion in finding that consecutive sentencing was "necessary in order to protect the public from further criminal acts." He asserts that he had never been charged with a crime before the offenses in this case and that "[a]fter fifty years of law-abiding conduct, he committed the present crime under what must be considered extremely unusual circumstances." Moreover, he claims that just because he "responded violently to finding his wife in a sexual encounter with another woman" does not mean that he "would respond violently to other unexpected stimuli[.]" Moore claims that the proof did not meet the preponderance of the evidence standard for this factor.

We conclude that the evidence established that Moore's partially consecutive sentence of thirty years in confinement was necessary to protect the public from further crimes by him. Although Moore claims that the trial court failed to consider his lack of a criminal record, the trial court clearly acknowledged this fact before determining that Moore posed a danger to society:

> [Moore] cleared this house no less efficiently than a trained military team would, to go through here and kill every living person that was in there, not only shooting them in the front of the heads but then after they're down on the ground, the second insurance shot to make sure that they were dead, all three of them. And so, I think the manner of these killings indicates to me a person who, for whatever reason—age 51—is willing to engage in conduct to take someone's life. And if he had just shot Ms. White and Ms. Snellings, maybe I could think, all right, he's angry at them but for the life of me, why did he execute Ms. Stagnolia as well. To me, that demonstrates someone who is certainly capable of engaging in that type of criminal

conduct whenever he's set off, and it doesn't have to be the person who is immediately offending, that he will at this point in his life, despite a prior record of showing he is not a violent man, is certainly dangerous enough that he will take someone's life who just happened to be at the wrong place at the wrong time.

Despite Moore's testimony that he killed White, Snellings, and Stagnolia, after discovering them involved in sexual activity, the evidence from the crime scene did not support his claim. Because the record shows that Moore moved from room to room in the apartment killing each of the three victims, the proof is more than sufficient to meet the preponderance of the evidence standard required for this factor. Therefore, we conclude that the trial court did not abuse its discretion in finding that Moore was a dangerous offender for the purposes of consecutive sentencing.

As a final note, we conclude that the trial court did not abuse its discretion in sentencing Moore to an effective sentence of thirty years. Although the jury acquitted Moore of first degree premeditated murder in all three counts, the trial court found that Moore made the decision to kill the victims when he saw White and Snellings together, even if they were not engaged in sexual activity at the time of their deaths, and that a partially consecutive sentence of thirty years was justified under the circumstances of this case. Because the record fully supports the trial court's findings, we uphold the sentence imposed by the trial court.

**VII.** **Cumulative Error.** Moore argues that even if the previous errors were considered harmless when viewed individually, the cumulative effect of these errors violated the defendant's right to due process. Because we have determined that Moore is not entitled to relief on any of his issues on appeal, we need not consider the cumulative effect of the alleged errors. See State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE